May it please the Court, Andrew Tweetmeyer on behalf of the Agua Caliente Cupeno Tribe. I would like to save five minutes for rebuttal at this time. Your Honors, this case has fundamentally always presented three questions. First, was the Cupeno Tribe ever federally recognized, and if so, second, did Congress ever terminate that federal recognition, and if Congress did not terminate that federal recognition, did that federal recognition ever, quote-unquote, lapse? Those are the three questions that the BIA has always employed, both in public and in court, to determine whether or not there has been an administrative error and a tribe's name must be added to the list outside of the Part 83 process. Now, you say that's the process that's always been used. Is that referring to the three cases, Tecuan and Ione and Lower Lake, or are you referring to some other tribe? Exactly. No, exactly. Those three cases and Muwekma, and bear in mind that in the Muwekma case, the Court determined based on those prior decisions that Muwekma was distinct from Ione and Lower Lake because there was no showing of communal land holdings and no showing of any pattern of dealings between the federal government. In effect, no awareness displayed on the part of the federal government that the Muwekma existed. Now, the Cupeno has addressed these three questions repeatedly in the past four years. The defendant has avoided them. His terse 2016 decision does not address any of them. He does not even make a determination as to whether or not the Cupeno were ever federally recognized. That is definitively arbitrary and capricious decision-making. He has not considered the relevant factors in reaching his conclusion. Now, in this proceeding ---- Well, if we adopted that approach, that would get you a remand for the agency to give an explanation. Possibly so, Your Honors. But I would push back that he's had four years. His attorneys have had four years with him to present some explanation for his decision. And what we have here is a proceeding in which his attorneys have not shown that the Agua Caliente Cupeno were never federally recognized. Do you agree that rational basis review is the appropriate standard here, though? Absolutely, Your Honor, and it's not easy. So then why isn't ---- I think they do advert to it to some degree, but even if not, the fact that this is arguably a splintering off, whereas in the other three it was clearly a question of were they in or were they out. No question that these people had been treated as part of a band of Native Americans. So the question of how they should be treated would seem to be a rationally different question than in the other cases. There's two problems with that. First off, I'll say, Your Honor, in his decision he makes that observation. He says there's a difference here. But he doesn't provide any rationale for why that should be legally consequential. Why is it that the Cupeno, living on and benefiting from New Pala, a reservation set aside for their benefit, and administering government-to-government relations through the auspices of the PBMI, should place it on a weaker footing than the Ione, Lower Lake, and Tohon. Those tribes, the Lower Lake, for example, was explicitly considered terminated. The record indicates that the Bureau administered no services to them for 40 years before reaffirming that. Why isn't it rational to say that if we've got to resolve a splintering kind of issue, that simply is a different and more complicated issue than deciding that we should have recognized these other folks, that it might be a better idea, it might be a worse idea, but it's not an irrational idea. For one thing, with the other three, you don't have in effect a third party, which presumably is the Pala Band, who might be interested in this and whose interests would have to be considered. Why is that irrational? That is irrational for the reasons I've set forth in my brief. Let me add to that. Don't the Part 83 regulations contemplate a situation where there's been a splinter off as well? Yes, they do, but that is not this case. And the reason why, Your Honors, is because if you look at the landscape underneath Pala, there are two reservations there as a matter of law. And this is something the defendant has avoided addressing. The old Pala reservation set aside by executive order in 1875 cannot have been melded with the new Pala reservation established pursuant to congressional mandate in 1902 without some act of Congress. So even today, there are two distinct and unequal reservations benefiting distinct groups of Indians at Pala. So this is not a case where there is a federally recognized tribe, we submit, from which any group has splintered. There was an economic association that was used between these two tribes with separate reservations, separate beneficial interests, and, in effect, separate government-to-government relationships with the United States. That association broke down recently when the PBMI purported to conclude that Margarita Britain was not a Cupeno Indian. They don't have authority to determine who or who is not a Cupeno Indian. That rests as a sovereign matter with the Cupeno tribe. So the underlying facts of this, the administrative record showing that for a century and a half, the United States has, even as there was this entity called the Pala Band of Mission Indians, nevertheless indicated its awareness of the Cupeno tribe, even up until the 2010 census, separately counting Cupeno Indians from Pala Indians. In 2008, notifying the Cupeno alongside the Palo Seno and alongside one explicitly identified unrecognized tribe of archaeological findings. The United States has known about this tribe. So it's not legally significantly different, we would argue, from the Ione, Tohon, and Lower Lake. Those tribes, in fact, had no relations whatsoever with the United States for decades before they were reaffirmed. And the Secretary's decision was controlled by considering, well, first, were they ever federally recognized? It appears they were. Second, Congress has never terminated them, and we've maintained this awareness of them, therefore they've never lapsed. A tribe does not easily lapse. In terms of the practicalities here, if we should rule against you, is there any reason you can't go into the Part 83 proceedings? The practicalities are that, effectively, the Cupeno tribe will then be considered terminated. And I would submit that, you know, we're here. Terminated because? I mean, if they win in the Part 83 proceedings? No, if they're made to go through the Part 83 proceedings. Under Section 83.3, Part 83 does not apply to a tribe that is federally recognized. So if this court says you have to go through Part 83, this court will be effectively concluding that the Agua Caliente tribe has been terminated, or that its federal relationship has lapsed. And so if that argument is correct, though, that applies to any time any people did try to break off, right? They would say that in going through the proceedings, you are giving up, what, a right? Is it a right that gets you something? Well, any tribe that is going through the Part 83 process is starting from the premise that it is not federally recognized. And that means either it was never federally recognized, it was terminated, or its relationship has lapsed. And in this instance. Or that there was an error in not listing it. No, if there was an error, according to the precedents, the explicit direction of the defendant's predecessors, before Congress and in court, if there's an error, the tribe does not have to go through the Part 83 process. Part 83 does not apply. Is there some sort of policy statement that says that? Well, in the record, you'll find Larry Echo Hawk's response to the House of Representatives inquiring about the Tejon reaffirmation. And he says explicitly, Part 83 does not apply to a tribe whose federal relationship was not terminated and has not lapsed. Congress did nothing in response to that. And I would submit that that's because it actually is consistent with the terms of the Federally Recognized Tribes List Act. The secretary, the assistant secretary, has a duty to maintain an accurate and complete list. And if he discovers he's presented with facts showing that, you know, there's this tribe that the United States has been aware of, it's residing on trust lands set aside for it, it should be on the list. That's an error. We need to correct that. What is the relief you're asking from the Federal court? From the Federal court, we are asking that the secretary's decision refusing to correct the list be reversed, and that the court order him to correct the list by adding the aguacate to the list. Order him to put the compendium on the list. Yes. And I anticipate, Your Honor, it's going to say, boy, do we really want to go that far and order the secretary to do so. And I would simply say that under the APA, this court has that authority. He has not. Does that affect property or monetary rights? There's talk of sand and gravel. Is most of the gravel on the Cupeno part and not on the other part? Or what's the story there? Undoubtedly, you're overturning an apple cart here. And there will be turmoil. But I would submit to Your Honors that we're coming to court simply saying we want equal protection of the law. And the flip side of that turmoil is that my client stands to have its Federal relationship definitively erased without an explanation. That's unacceptable. That's what the APA is for. And I'd like to reserve the rest of my time for rebuttal. I'll answer your question. Your equal protection is not ñ is about equal treatment with the Tejon and other cases, not intrinsically equal protection with the Palo. Yes. We're asking ñ yeah. Okay. Let's hear from the government. May it please the Court. Brian Toth from the Department of Justice, representing the Assistant Secretary, Indian Affairs of the Department of the Interior. I think, although there are many different paths this Court could take to affirm the district court's judgment, I'd like to present the Court with two straightforward steps. Looking at the relief they seek, it's one of two ñ one of two types under the Administrative Procedure Act. It's either an order compelling the Secretary to recognize the tribe, which it sounds as if my friend just asked for again, or it is ñ and that would be properly construed under Section 706.1 of the APA. Or, or in addition, they're seeking to set aside the explanation that the Secretary provided when it denied their request to administratively affirm outside the Part 83 process the plaintiff group. That would be properly construed under 706.2 of the APA. Taking 706.1 first, it's abundantly clear after the Supreme Court's decision in Sua v. Norton, it's the southern Utah case, that in order to obtain relief under 706.1, plaintiff has to demonstrate that the agency is under an unequivocal command, both the duty that is required as a legal matter and that it is a duty that is to take some discreet action. And this Court has explained, elaborating on that standard, what means ñ what it means to be legally required is essentially that it meets the standards for the traditional writ of mandamus. And that does require a nondiscretionary duty, essentially to take a ministerial act. Recognizing an Indian tribe is by ñ is not at all a ministerial act. It requires agency expertise to weigh historical evidence, to consider the history of the group, and to evaluate the various criteria that the agency has developed and has followed for essentially 40 years under its Part 83 regulations. There's an administrative process in place for this group to go through, and the Assistant Secretary directed it to do so. There's nothing that, from my standpoint standing here today, that prevents this group from submitting the petition under Part 83. Roberts. Could you respond to counsel's argument that by requiring them to go through Part 83, we're effectively saying that any recognition they may have had or have is terminated? What ñ I don't ñ How do they start out? What ñ they just start out as a potential tribe that is seeking Federal recognition as a tribe? Is that ñ The regulations call them a petitioner, and they talk about petitioners being indigenous groups that are seeking acknowledgment as a Federally recognized Indian tribe. The regulation that my friend is pointing to to say that they have to give up their status is 83.3, and that says this part does not apply to Federally recognized Indian tribes. 83.1 then defines that phrase simply to mean tribes that are not on the list. So it's a circular reasoning. I don't think there's anything that diminishes, you know, their own view of themselves as an independent Indian group that's organized itself. They're simply going through the prescribed process for the government to formally acknowledge that. And as the district court remarked, I mean, they presented a fair mass of historical documents and historical evidence. It's just simply not the role of the generalist district court judge to sift through all that evidence, nor should it be. I mean, it's a ñ it's a very mountainous task in the first ever instance. Kennedy, you're not taking any position antagonistic to their view that they should be listed. Correct. If they go through the process. Correct. Now, I mean, the Assistant Secretary's decision distinguishes them from the other groups on the basis that they were disenrolled from another Federally recognized tribe. And as one of Your Honor's ñ You said they were disenrolled or they're seeking disenrollment? They were disenrolled, is my understanding. It was the ñ As of what point then? I haven't focused on that. It was ñ it was approximately 2011, 2012. You have a prior case that dealt with that. The Aguayo decision affirmed the Secretary of the Interior's decision to stay hands off in a disenrollment action. Well, I see that they, in this case, being the individuals, not the group. Correct. I mean, they are, in fact, the same group, but the ñ the disenrollment technically was of certain human beings. That's right. And I mean, Judge Brooks brings up a good point, is that one of the requirements of a Part 83 petition is that they have to provide membership lists. So the Interior Department can determine who the members are and how they make up this group. Are they the members, in fact, of all the Indians claiming disenrollment in the prior case? That's one of the preliminary steps. In addition, I mean, this 40-year regulatory process ñ not 40-year process, but this process that has been in place for approximately 40 years, it ñ you know, it acknowledges that Interior has an office dedicated to this task called the Office of Federal Acknowledgement. That is ñ it employs experts in anthropology, in ñ expert historians, expert genealogists, and the thrust of a lot of these cases that we've cited from other courts of appeals ñ I don't believe there's been a Ninth Circuit case expressly on this issue, but finding that the Part 83 process is an exhaustion requirement when a group seeks a court order formally acknowledging them or recognizing them as an Indian tribe, the thrust of all that reasoning is that Interior possesses the expertise to deal with those questions in the first instance. Any decision that comes out of that process is going to be subject to judicial review. A negative finding on the petition, for instance, could be reviewed as final agency action, and if they're recognized, there have been cases where people who were ñ groups who were interested in the process, if there's another group claiming recognition as the same tribe, they might be able to challenge a positive finding. So the plea from the government is simply let the process work. Now, I know in the past there have been instances where, as my friend mentions, the Secretary has gone outside this Part 83 process to administratively change the list, to acknowledge that there was a tribe that historically should have been on the list and that was left off. But I would submit that in addition to distinguishing this plaintiff group from those other groups, like the Tejon and the Ion Band and the Lower Lake Rancheria, the Assistant Secretary's explanation also did rely on a newly formulated policy, which was published in the Federal Register in July of 2015, which now directs groups seeking acknowledgment as a Federal Indian tribe through any administrative means to go through the Part 83 process. Now, this was a policy that was adopted simultaneously with a revision to the Part 83 regulations around June or July of 2015. Those regulations were revised at the time because that process has been criticized for the length of time it has taken in some cases, the expense it is required of groups petitioning, and the volume of the record that's generated when Interior puts out its final decision. Interior was making an attempt to reformulate that process, to make it more transparent, to make the agency more accountable by phasing the review process, by imposing deadlines, by eliminating an unnecessary administrative appellate step before the decision was final. And accompanied by that, it adopted this 2015, July 2015 policy to say, you know, groups where you have tried to circumvent the Part 83 process in the past, be on notice that you can't do that any longer. We've we're trying to make this process more transparent. We're trying to make it work to address the criticism from, you know, courts, in fact. Does that really insulate you since this process started before the 2015? I mean, if their argument is a good one, that there's no rational basis for the Secretary's decision, then the 2015 policy wouldn't save you, would it? Well, I think that the policy was adopted while their letter request was pending before the Secretary. So I don't think it's technically a retroactive application of the policy. I think it was applied while their petition was being considered. Well, not petition, but their letter request to administratively reaffirm. So I think it would be sound to rely on that. But as you mentioned, Judge Boggs, there are at least two different rationales in the Secretary's letter. The reliance on the policy and. We do have some cases from other circuits where people have tried formally what they're doing and they lost. Has there been any case where a group has tried to go outside 83 and gone to court and won? Not. They have not won, not that I'm aware of, not in order of compelling recognition. The Mwekma case is the closest where the district court ordered Interior to respond to such a request. That case is a little complicated because. In this case, they did respond. They just responded negatively. Right. And that explanation was it was a denial in the Mwekma case and the D.C. Circuit upheld that explanation. That comes out sort of the same way as where you are so far. So is the other reason in the letter sufficient here? The. That is the splintering off. Yes. I think that forms a rational basis. And I'll explain why that's an important criteria. I mean, the regulations do speak to splintering groups. Now, there's a question raised as to whether this plaintiff is a splintering group. We're not saying that they are. That's because they were disenrolled. That's right. Affirmatively disenrolled. That appears to be the case. I mean, they're claiming for approximately 50 years their entitlement to Federal services through membership in another tribe. I think that presents at least a special situation that warrants closer inspection. And the agency has the regulations. It has the expert capacity to give that type of request the scrutiny that it deserves due to its complexity. They're not similarly situated to these other groups who are not claiming their Federal services through membership in a tribe that was already on the list. And I would further note that that regulation says that even if the group is a splinter group, there are circumstances where the Petitioner can clearly demonstrate that it has functioned from 1900 until the present as a politically autonomous community and meets this other criteria of unique membership, which would nonetheless entitle it to continuing forward in the Part 83 process. So whether it's a splinter group or not doesn't necessarily dictate whether it will be, whether it will not be recognized. There was recognition by the Federal government of this, of the Quipinos, right? I don't mean that formal, but there was a relationship. There appears to have been a relationship. A long time relationship. And there is evidence that they've submitted of that. Now, I mean, it predates the 1979 regulations. They bought the land next to the Luzania Pala. Right. So what happens is, under the Indian Reorganization Act, there's a tension between interiors stepping in and sort of setting things, setting Indian affairs right in the way that it thinks is correct and allowing Indian groups to function with autonomy and with self-government. And here you have a group, it appears that even though there was a single vote conducted in 1934 on these two, as my friend calls them, reservations, but interior, by conducting a single vote, treated them as one reservation, the residents of there voted no for applying the Indian Reorganization Act. So the two groups voted differently because it was almost unanimous to reject, right? It was 66 to 7. I believe it was, yes, an overwhelming vote no. Nevertheless, I mean, I think as maybe the blue brief explained, there was a decision in the early 1960s or so, around 1960, for the Copeno and the Luzania to organize and form an entity that went on to become the Palaband of Mission Indians. And they submitted a constitution to the Secretary of the Interior. And even though they had previously voted on that land not to apply the Indian Reorganization Act, they took a valid step to organize and form a governing document, and the Secretary approved it. That group then went on. It had its disputes, it appears, but it went on for approximately 50 years to govern itself. And now you have the Aguayo decision affirming Interior's decision to take a hands-off role because the Palaband of Mission Indians had elected to amend its tribal ordinance to not provide Interior a role for approving membership disenrollment decisions. So there is a tension here between, you know, tribal autonomy and what appears to be a just result that the government might step in to bring about. But you know, I would submit that the proper way to resolve this and to sort this out, and the way that would be most fair, would be to allow Interior to consider these matters through its regular administrative process. And if they were successful under Part 83 and then were placed upon the list, do we know what kind of effect that would have on the underlying economic issues here with the sand and gravel and so on? I can't say what effect it would have. I don't know. Okay. And unless the Court has any other questions, we ask that judgment be affirmed. Your Honors, there's a lot I want to respond to there, and I'll be as quick as possible. First, this is not the Aguayo plaintiffs. That is a separate case with individuals. I am representing the Cupeno Tribe. The Chairman of the Cupeno Tribe, Willie Pink, is in court today. He is not disenrolled from the PBMI. Vincent Marufo, a Cupeno member, is in court today. He's never been a member of the PBMI.  Yes, but the two individuals in court today are members of the Cupeno and have never been disenrolled from the PBMI. So these are not the same cases. Now with respect to my friend's observation that 83.1 renders my entire argument circular, I take the Court back to the three questions that the Secretary has considered in past reaffirmations. Was the tribe, did the tribe have a federal relationship? That now seems to be undisputed. Was it ever terminated? That's never been disputed. Was it lapsed? That's where this case is decided. Was there a federal relationship? Did it ever lapse? The defendant still remains silent on that point. There are two reservations at Pala as a matter of law. Defendant has provided no answer to how an executive order reservation was melded with a congressionally mandated reservation. Two groups of Indians benefiting from legally unequal and distinct reservations. With respect to the 2015 policy guidance, another flip-flop in defendant's answer, he says the 2015 policy guidance effectively changed policy. Now you've got to go through Part 83. In the district court, when I pointed out that would be the application of ex post facto law, defendant took the position that, well, no, it doesn't really change policy. All it does is reaffirm what BIA policy has always been. That is that a tribe that seeks recognition in the first instance or after a period of lapse must go through Part 83. That's exactly what Larry Echo-Hawk said when he reaffirmed the Tehum. That's exactly what we have argued throughout this entire case. Hit those three questions. Show us, show us, how did the Compania tribe lapse? Four years, he has never done that. So I would submit to your honors that at this point, he and his attorneys have demonstrated that the record does not support them. The Compania tribe should be on the list. With respect to Muwekma, yes, that is the most similar case to what we've argued here. But the court did not simply order the secretary to respond. It ordered explicitly to cogently explain why Muwekma was treated differently from Ion and Lower Lake. And in this case, your honors have noticed that the assistant secretary simply observes that you, Compania, withdrew from what he says is a federally recognized Indian tribe. There simply are not facts in the record showing that the PBMI, an association of at least two groups of Indians with two distinct reservations, is a single federally recognized tribe. And we've seen this in this proceeding where defense counsel have just sloppily referred to the Palaband, which is simultaneously, according to defendants' briefs, an entity that was formed in 1961 and established its federal relationship with the United States government in 1891. That is irrational, okay? This decision is not- So what happened in, what was it, in 91? 1891? I'm sorry, 1893. In 1891, the Indian Mission Relief Act was passed, and the United States effectively patented to the Old Pala, Luiseno, the exact patch of land at Old Pala that was set aside for Old Pala, for the Luiseno by the 1875 executive order. So the idea is that by that application of the 1891 Relief Act in 1893, the, quote-unquote, Palaband established a relationship with the United States. But at the same time, the, quote-unquote, Palaband was formed in 1960, and my clients purportedly were disenrolled from the, quote-unquote, Palaband. This is irrational. Thank you, Your Honors. Thank you for counsel. Both sides, we appreciate your arguments and the matters submitted at this time, and that ends our session for today.
judges: Boggs, Paez, Owens